Mr. McDougall. Yes, Your Honor. Please proceed. Good afternoon. I'm Mark McDougall for the Plaintiff Appellant, and my co-counsel, Greg Kifori, is here with me also. I'll be the only one arguing today. I would start by addressing the Welch case, which the Court brought our attention to that was decided yesterday. I think that it supports the plaintiff's position that the magistrate judge erred in that the plaintiffs were the only ones to submit affidavits as to my, Mr. McDougall's, hourly rate and Mr. Kifori's hourly rate. The defense chose not to submit any opposition to the hourly rate. That left the district, the magistrate, with only an economic survey, which she relied upon. But what's wrong with that survey? A lot of things are wrong with the survey. Number one, you'll see the survey questionnaire itself at the last page of our brief. The standard for determining an hourly rate is the skill, reputation, and ability of an attorney doing comparable work in the market. The survey asks no questions. You have no idea what the Respondent's skill level is. It's silent on that. You have no idea of the Respondent's reputation. It's silent on that. You have no idea. Sotomayor, would you agree that it's not improper to use it as some sort of a benchmark? Well, I would agree that if you think about it conceptually, it might have some relevance, but when you look at the factors for the hourly rate, you have to sort of say it doesn't go to skill, it doesn't go to ability, it doesn't go to reputation, and it doesn't go to similarity of work. Somebody just checks a box that says litigation, non-personal injury. What type of work is that? How many people filled it out? How did plaintiff's counsel fill it out? We really know very little about, as applied to a particular case, our client. Was there a dog book here on this? No. Was there any evidence as to the methodology, as to the statistical validity? Anything of that sort presented? The survey itself describes what it did. And I think if you look at what it did and you look at the factors, it's, you know, it's got some relevance, just like what the ---- Was there an objection to some use of the survey, however? My understanding was that there wasn't an objection to reference to the survey or some use of the survey. Is that correct? That is correct. We do not seek to strike the survey from evidence or anything such as that. Let me ask you about the ---- I'm sorry. Go ahead. I just want to ask, I assume you're representing Mr. Goode's attorney's fees as well, right? Yes. He did not have on his behalf any attorney affidavit suggesting anything as to his scalability in place in the Portland market. So the district court took his $250 fee, which he put in, then looked at the survey and then came up with a number. What is your position on that methodology, given the lack of a supporting affidavit? I would say it's unfortunate that Mr. Goode did not have supporting affidavits for his fees. I would agree with the court in that regard. He said what his own fee was, and he gave some of his own experience, but that's just some evidence. It needs more evidence than that. The court then went to the fallback of the survey. And I think that when you've got the situation such as Kefauri McDougall's fees, where you've got affidavits from a former president of the Oregon State Bar and from a prominent trial attorney that says that the rates they're claiming are charged by the hour, you need to put in something against it. And they didn't do that. Let me ask you, then, about your own affidavits. Yes. It seemed to me that they were missing anything about attorneys in the community doing similar work, charging the rates that you were charging, who had your skill and reputation and so forth. You had affidavits. Williamson and Woodcock reviewed the pleadings. I mean, there was no evidence that they reviewed the pleadings or knew anything about this case. They simply said you were good guys. But was that — were your affidavits sufficient alone? Well, I don't think they have to know a lot about the case, other than the nature and type of case, civil rights litigation. The prevailing market rates, if that's our flaw, then the survey is a hundred times more flawed. But I don't think that's our flaw, because I think that the prevailing market rates are by what you would bear for that type of work in the community. It's not fact-specific as to the particular facts of that case. It's cases of similar nature. Well, I read the Blum case, 465 U.S., and it says in addition to the attorney's own affidavits, they have to show the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. And your affidavits didn't seem to include that. I would point to Mr. Wobrock's affidavit, ER-204, paragraph 4, saying that he's generally familiar with hourly rates as charged by successful plaintiff's attorneys in the Portland area, with the equivalent skill and experience as myself and Mr. Kafoury, and that the hourly rate that we request of 400 and 350 an hour are appropriate. You know, he talks about his familiarity with the market rates and the appropriateness of the rates for the type of work done. And that was the affidavit of Mr. Wobrock? Yes. On page what? ER-204. We always have some difficulty in these for firms that operate primarily as contingent fee firms and not necessarily setting on a day-to-day basis or not having the bulk of their work come in at an hourly rate. So other than his affidavit and then the calculation of total yearly hours and revenue, is there anything else that could be done in a contingent fee case to show what would be a reasonable hourly rate for, say, civil rights or a plaintiff's attorney? I am not aware. I did what I thought was reasonable. I asked my accountant what would be my actual hourly rate, and I asked a former president of State Bar and a prominent trial attorney to give an affidavit with regard to their opinion as to our rates for this case. And we did. As litigants in these cases do, they do it with an understanding that they're not trying to build another huge record and have another big litigation. Defense had the opportunity to come forward with evidence, which might have stirred it up, could have taken depositions, could have done something, but they didn't contest it at all. And I think from the affidavits on record, it's a reasonable inference that our hourly rates would prevail for this type of work in the community for people of our ranking. What about the other one of the challenges to the fees and one that the magistrate judge accepted was what was generally referred to as block billing? Would you address that? Yes. We have entries that are for large numbers of hours that talk about trial preparation and witness preparation. Defense counsel, whose bills are in the record also, have entirely similar entries that they're billing their client. Now, I know that's not the rule. Just because you did it means I can do it. But I think it is some reference to custom in the community and the practical realities of trial preparation. You're doing numerous tasks at the same time involving a lot of different people, and it's not the type of situation where you can say, you know, I was working on this, you're putting it down, going back to it. You're multitasking, as much as that word is overused. And that's my only explanation for it. I don't think it would be. You don't get any help for your position from Welch. What Welch says is that they discourage block billing. I get a little bit of help because the magistrate judge did not identify which entries were block bills and then reduced them accordingly. The magistrate judge actually just discussed the block billing, but then said, even though I've discussed it, I am going to do a one-third across-the-board reduction because your team had three attorneys and, therefore, I'm taking one-third of all your time away. That's how she reduced our hours, even though she discussed block billing. It's one-third everywhere. And that's patently unfair in a case where the other side had at least eight attorneys and 14 people billing the district, and our hours. The other thing I'd say about the block billing. Ginsburg, let me just ask this. She said more than that. She said there was evidence of duplicate work, of redundant hours, in addition to the fact that you didn't need three lawyers. But she didn't say because you had three lawyers she was going to deduct one-third. But when it came to the actual subtraction of our hours, she didn't do a specific approach with some minor exceptions. She just said you lose one-third. If you look at her calculation at the back of her opinion, she just takes a third of the hours off of each one of the attorneys after some minor reductions. Well, in her opinion, in Excerpt of Record 317, she talks about duplication of work, no effort to exclude redundant hours, et cetera. It wasn't just because you had three lawyers. Am I incorrect in that? You are not incorrect that she addresses it. But if you look at her calculation, which is in her opinion, and I'm trying to flip to it right now, at ER 323, you'll see the reduction in hours. And, for example, one of the reductions in Mr. Good's hours that's specific that we're appealing is taking away time for briefing whether or not Plaintiff's counsel should have been sanctioned. Yes. Do I understand? And also because he worked at home. Right. There were a couple of things in there that might be subject to question. I was going to reserve some time. I've got 52 seconds left. You can have all of it. Actually, you've got minus 57 seconds. Excuse me? You've got minus one minute. Oh. I'm sorry. We'll see. We'll give him a pause and count. May it please the Court? Bruce Campbell for the Portland Public Schools. In this case, the district court properly exercised her discretion in setting hourly rates for the plaintiffs and in reducing the amount of time claimed by the plaintiffs. The Supreme Court and this Court have recognized that district courts have broad latitude in setting a reasonable attorney fee in cases like this. All right. They do have broad latitude. Excuse me. You haven't had a chance. Go ahead. Based upon the proper factors, but here the district court relied on the survey, which has nothing to do with the fact that it's announced by our court, the Supreme Court, as being relevant. Your Honor, I would submit that the survey is very powerful evidence of the prevailing market rate. We all agree that the touchstone here is what is the prevailing market rate for attorneys in Portland? And the survey has, on a comprehensive basis, has determined that the prevailing market rate for attorneys of certain types of experience and certain types of litigation. The District of Oregon has issued a notice to attorneys saying that this is a the initial benchmark. It's not the be-all and end-all. Where do you get the prevailing market rate? Where does that come from? Which case does that come from? Prevailing market rate, I believe that was used in the Welch case. It's also the Bell and Trevino case. In Welch, the court kept falling back to the prevailing market rate. Can you point to me where that case comes from? I've got Bell here. I've got most of the cases here at Welch here. In Welch, I'm looking at page 2502. And when the court faulted the counsel for using, it said, we have repeatedly held that the determination of a reasonable hourly rate is not made by reference to the rate to actually charge the prevailing party. Rather, rates should be established by reference to the fees that private counsel charge their paying clients for legal work with similar complexity. And so where does the survey do ability and reputation? Comparable complexity. Similar complexity. And where is the word market rate, which really I'd ask you to justify? Well, in the survey, it pulled attorneys throughout the state of Oregon, and it breaks it down by geography. So there is one for Portland, which would be the appropriate relevant mark. Does that have to do with complexity, or does that have to do with comparable or legal work? What does Portland have to do with any of these things? Well, then that is further divided by different types of work. For example, there's bankruptcy, there's commercial litigation, there's plaintiff civil litigation. It's broken down into several different types of categories. Are all of your cases of equal complexity? Are all civil cases, everybody that works in your field working on cases of equal complexity to yours? No, Your Honor, they're not. Some people work on much simpler matters than you are, and I suppose there might be some who work on more complex matters. Where is that reflected in the economic survey? The economic survey is not that refined. What it does is it breaks it into broader categories. And then it's up to the parties and to the judge, the district judge, to make the appropriate adjustments up or down based on complexity, based on the experience and skill of counsel, based on the four core subsumed factors. But that's not what she did. I mean, what she did is she went straight to the average for all three lawyers, I mean, with a few dollars difference, lopped off a third, and then said that's what you get. I mean, that's what I saw happen. I would not agree with that, Your Honor. The average, the mean rate, was 186 per hour. The only attorney who came close to that in terms of the final rate was Mr. McDougall, who the court awarded fees at a rate of 185 per hour, given his level of experience. But for Mr. Kafoury, the trial judge awarded Mr. Kafoury rates at $235 per hour, which is over 25 percent above the prevailing or the, I shouldn't say prevailing market rate, over the average for civil litigation. Mr. Goode, there was a $14 difference for him. So she did make specific adjustments for each of the counsel. And not much. Now, how do we know that the survey reflects reality? Well, I think the — I would submit that the methodology in the survey is far better than you get when you have an attorney who submits an affidavit. You could submit that all you want, but do you have a expert, somebody swearing to that? Well, we had — the survey itself shows the methodology that was used, and it came in — All I see is that it's a printed page with somebody having put words on there. It could be true words. It could be false words. They don't speak at all about the normal things you speak about when you talk about statistical sampling and whether or not — it sounds to me like somebody sent out a bunch of letters and then got a bunch of responses back and said what happened, what we got. I mean, I don't see anything in there that suggests that there isn't some sort of skewing involved. But most of all, you have to believe what they say. Is there any reason to believe what they tell themselves to be? Your Honor, I would say that if the plaintiff's counsel believes that the rate was inaccurate or the survey was inaccurate or was not competent evidence, they should have objected. But it went in without objection. But they submitted affidavits that indicate that their prevailing rates for attorneys of comparable scalability and nature of practice are far above those that are listed here as the average. Your Honor. You didn't dispute that, did you? Well, but no, we did not, Your Honor. I think the affidavits, though, as a district — Well, let's just stop there, though, because they put in their affidavits. You didn't bring in an attorney to say, well, that is so far above what we believe is a comparable rate that this is a skewed affidavit. So isn't that the evidence in front of the court as to what an attorney of their nature, scale, practice, years of experience would bill? I don't believe so, Your Honor, and this is why. Because the — I think the affidavits lacked a proper foundation in the sense that one of the affidavits, I believe, is Mr. Wobbrock did not say anything about prevailing  All he said was — But, you see, that's not the — what the case just — you just read. Prevailing market rates, as I read it, is just a moniker or a backhand way of the factors that the court's talking about, which is years of practice, scale, experience, et cetera. The only thing that Mr. — and Mr. Williamson's — Do you disagree with that characterization? No, I do not, Your Honor. But I was — in Mr. — I believe it's Mr. Wobbrock's affidavit. The only thing he says is that he was asked to perform work in one case where he charged $375 an hour. It doesn't say what kind of work, any context other than that. Mr. Williamson's affidavit says — there's a statement in there, and it's rather vague, but it says there's little doubt that firms that regularly bill by the hour who generated such fees would command rates of $315,400. Again, he doesn't say what the basis is for that knowledge, whether he's actually familiar with the rates charged by other attorneys in Portland. I know more than the people who wrote the survey say. I mean, we don't know whether the market in Portland, for example, involves a lot of piddling litigation. So when you get this average, this is weighted by the fact that a lot of lawyers are doing a lot of routine work that doesn't require much complex imagination of how they ever go to trial. We don't know anything about that, how you get to that average. All we know is that it's an average. Nobody explains it to us. Certainly no — you know, at least here's somebody who actually looked at these lawyers and expressed an opinion based upon years at the bar, and one of them was president of the bar, I believe. That's right. Mr. Williamson had been a former president. Right. And he expressed a view under oath. If somebody lied in the survey, either people responding to it or the people who put it together, would you be able to prosecute them for perjury? I mean, let's say somebody sent in a false entry that was reflected in the survey. Could that person prosecute for perjury in Oregon? Not to my knowledge, they could not be. How about if the people who put out the survey decided to falsify the methodology and what they actually sent here isn't really what happened? Could they be prosecuted for perjury? I don't believe they could. Yeah, I don't think they could. But let's say, for example, one of the people who put an affidavit in support of opposing counsel's fee petition. Let's say they lied in the affidavit. Let's say, in fact, they were not the president of the bar. Let's say they practiced law less. Let's say they made a misstatement. Could they be prosecuted for perjury? Absolutely. There we go. Well, that's a difference, you see. Yes, Your Honor, that is a difference, but I think, again, that... I'm a little surprised that the District of Oregon has actually adopted a court rule that accepts this thing as a baseline. It's a little troubling. Well, if the plaintiffs in this case, though, wanted to step away from the survey, they should have objected to it at a minimum, which would have... It's a little hard to do when the court adopts a rule saying this is where we're going to start from. It's sort of like kicking the judges in the shin. It's a foolish thing, I think, for the court to have done. Well, I would say that it's better to start at the... make the objection at the district court level than on the appellate level. Well, even if... apart from the hourly rate, one thing that bothered me was his statement about block billing, which from Welch we know is, you know, may not be the best practice, but it's not an... it's not one that isn't found in private practice. And here, a lot of the hours, of course, took place during trial. And I'm having trouble understanding how the district court can just make an across-the-board meat-ax cut simply because there were less detailed entries, for example, during the time of trial. What is your view on that? It's sort of in multiple parts. Number one, the court only made the one-third reduction for trial-related time. It wasn't across-the-board. It was just when it was associated with having two more attorneys come on at the eve of trial. I think block billing was the least of the problems here. Mr. Kafoury and Mr. McDougall did not keep contemporaneous time records. They created their time records four years after the fact. Based on computer records, research records... Memory. ...paper, memory. And at Hensley, I think... And was there anything... I mean, that's where I'm having some trouble because it's not that long that I've been out of practice. And in the 10 years that I've been out, you know, that's how people bill for trial. You know, you go to trial, you get up at 7, you're at the office, you leave at 10 at night. And your records, although not proper necessarily to compare for hours, the Portland school records look much the same, prepare for trial, do witness outlines, and prepare cross-examination. So what's wrong with that? Well, what's wrong with that is, number one, it's four years after the fact. So you'll notice in the entries, not only the Welch case faulted the counsel for billing in quarter-hour increments and approved a 20 percent reduction based on quarter-hour increments. Here, Mr. Kafoury and Mr. McDougall's time was basically in one hour. Every hour was rounded to a flat zero. So there were no breaks because that's because they did it four years after the fact. Hensley, in the Hensley case, the U.S. Supreme Court approved a reduction of 30 percent based on failing to keep contemporaneous time records. And that's the problem here. And Hensley talked about hours not properly billed to a client are not properly billed to an adversary. And I think from the private practice example, it would be very difficult to go to submit a bill to a client four years after the fact, saying, well, I based this on computer records and memory, and this was four years ago, and when they're all 14.0. Well, certainly if you went to trial for a client and, you know, you got up in the morning, as Mr. McHugh suggested, and then, you know, you worked on the case all day, and then, you know, afterwards, after court was done, you prepared. I mean, what do you do during trial except prepare for the next day's proceedings? Sometimes you've got joint instructions and things of that sort to work on. But there's not a lot of free time. There's not enough time to say, well, I'm going to take time off and go to the movies this afternoon. Or even if you have lunch, that you're not spending lunch either talking about the case or strategizing about the case or thinking about the next witness. And I don't think a client would begrudge being billed for the entire period, particularly a client who was there and saw what was going on, because a lawyer really is immersed in the process, the entire period, at least as I know trials. I think that's correct, Your Honor, and that's, you know, a big – probably the majority of the reduction, the one-third for trial-associated time, had to do with bringing in two new attorneys on the eve of trial, and the court found naturally – Because what she does is she says, well, there's this problem because you've got duplicate hours. You've got block billing. Mr. Goode, you work at home. We've got this problem and that problem. And she says, and then I'm going to take a one-third cut in the 2001 hours. So we don't know that the bulk of it was because of duplication, which would be legitimate. It's my understanding, and I'm looking through the Court's opinion, that she does go through and talk specifically about the hours that were – that she's reducing. She just didn't cut one-third across the board, but it was rather the time that was really starting in the fall of 2001. That was really the trial prep and trial time. Ginsburg. But what about her reduction of the time it took him to defend Mr. Goode, to defend himself against the claim of misconduct during the trial proceedings? Why would that be deducted? I think the logic there was that this was post-trial, and the district made a motion to recover fees against Mr. Kifori. It was aimed only at Mr. Kifori, not at the plaintiff. And so the time spent defending Mr. Kifori would not be – was not spent in pursuit of the plaintiff's claims. All right. What about the district court taking into account the cost of Goode's overhead in calculating his reasonable attorney fee? Your Honor, I think that was an unfortunate line in the opinion. I don't think that that was what drove it, what drove Mr. – Mr. Goode's time being set at $200 an hour. I think it was more a product of – it turns out that Mr. Goode, his claimed rate, what he called his contract rate of $250, was actually a rate that he would claim in default proceedings, because most of what he was handling were routine collections, small-dollar collections actions, where he would submit affidavits saying I – or submit bills for $250 an hour. It was not contested because there was no party to contest it. Okay. Well, you're over time, but you agree then that her deduction because he worked at home would be inappropriate? I think if she did base that on, yes, his cost structure, that would be inappropriate. And I think that was just, as I said, an unfortunate line in the – in the opinion. You know, explain to me why it was okay to reduce everybody's loans by a third because they added lawyers for trial. It's not unusual to add a trial team. You might bring a case, hoping to settle it, but then say, look, I don't have enough manpower to take the case to trial. Did you try the cases by yourself? I did not. I was not involved in the trial at all, Your Honor. Was defense lawyers? Was there only one lawyer at counsel table? No, there were two. There was a – It's not unusual to have two lawyers at counsel table. That's correct. And I think – I think what the district court said is if Mr. Good had brought in one lawyer, one more lawyer, then that would have been understandable. But to bring in two more who had to be brought completely up to speed was grossly inefficient, and it's a charge that should not have to be borne by the district. It's a little odd for the court to be making that kind of judgment. I mean, after all, they did win. Well, that they did, but I think this is – and it shows – this is what the court – this court said in Welch and also the Supreme Court said in Hensley is that the trial judge really has the best vantage point to determine what charges are reasonable and which charges are not, and that's why the court is given wide latitude and why we have an abusive discretion standard. And I think these were matters that were within the district's court. The judge got it wrong the last time, too, so – I mean, there was not simply the merits. There was this whole lawyer's issue involving Mr. Kafoury that she got wrong, which was a little troubling, which made me wonder whether maybe she was trying to appease, because she really disagreed with our ruling that what Mr. Kafoury did was perfectly fine. It does raise also that troubling issue, doesn't it? Personally, I don't think so. I think – I – I think Ma'am Street-Stewart is a fine judge, and she would – I would not expect her to act in that kind of fashion. I think she follows the law with fidelity and does her job as she's supposed to. Another thing that I wanted to ask you about that was somewhat troublesome is she's – she says the defense properly delegated work down to lower billing, associates, paralegals, et cetera, but the plaintiff's attorneys didn't do that. And that seems to me to be looking at – you know, most defense firms operate on that kind of a structure, where they have a pyramid of personnel, and the attorneys – there's not any evidence here that, you know, that's the structure, for example, of the plaintiff's firm, or that it wasn't actually more efficient, albeit at a higher hourly rate, for more experienced lawyers to do these things, because, as you know, sometimes associates spend way more time doing what an experienced lawyer can knock off in an hour or two. That kind of judgment seems to permeate the decision here. And maybe you can comment on – because it seems to me that did drive part of her reason for reducing, was this view that the plaintiff's just overspent on the case. Is – I mean, is that an incorrect impression of her opinion? Well, Your Honor, I think that that did show up quite a bit. As I – there are a lot of deductions that the district court made that have not been challenged on appeal. And there are things like Mr. Goode, for example, would deliver – he hand-delivered pleadings to our firm, and would charge half an hour, three-quarters of an hour for that. And the district judge properly determined that that's time that could have been – a delivery service could have done that a lot more efficiently. And so the defense – the district should not have to bear that cost. So there were – I think that's what's permeating the opinion, those specific types of tasks. And that's why the gross hours for the district, I think, were greater. You know, I guess that gets kind of to the big question, is that a number of her But she doesn't then take the hours and then deduct those specific things that she's – you know, that are perhaps either overbilling or, you know, not value billing. She then does this across the board. So how – if she articulates those things, but then doesn't actually do the calculations consonant with her explanation, how are we to figure out whether the one-third cut is reasonable or not? Well, Your Honor, I think the one-third cut has to do not with the specific tasks, you know, lengthy conferences or hand-delivering materials, but rather that has to do with bringing two attorneys in on the eve of trial and with Mr. Kifori and Mr. McDougal's failure to keep time records. Any time spent or recreated four years after the fact is inherently unreliable,  But if I look at the chart, it's true for Mr. Good, she takes off nonrecoverable hours, 109 of them, which is pretty significant. But to Mr. Kifori and Mr. McDougal, she takes off .75. So that's kind of where I'm having some trouble. I'm trying to figure out what to benchmark the decision against, because I see her written opinion and her complaints, but I don't see how that's reflected in, at least as to Mr. Kifori and Mr. McDougal, in their fees. So maybe you can enlighten me somewhat. Maybe I'm just not seeing it. If you're looking at page 323, which is her little chart, the judge's chart. Now, I believe that that chart then ties back to the kind of support for that is at page, I believe, 318 of the excerpt of record, page 14 of the district court's opinion. Right. But do you see my question is that basically she put Mr. Kifori's and Mr. McDougal's claimed hours, and she didn't reduce them by any specific issues related to being a messenger service or this or that. The only reduction that I see, unless I'm missing something, that came off their hours was the one-third across the board on their 2,000 hours, year 2,000 hours, which are, you know, for Mr. McDougal is 100 percent of his hours. That's correct, Your Honor, and that's what, with respect to Mr. Kifori and Mr. McDougal, they were not engaged in those type of activities that Mr. Goode was, and so the only reduction other than, I think, a 0.35, three-quarters of an hour reduction for Mr. McDougal was the one-third for trial. Okay. Okay. I just want to make sure I was understanding that. Thank you. That's helpful. Thank you very much. I want to take a minute or two for rebuttal. On the issue of block billing or contemporaneous time, the reason why the Court wants those detailed time records is to make sure that someone's treating somebody fairly and not overreaching. I submitted to the district court that the way we did it, if anything, penalized ourselves. I think when you look at the actual record and their trial counsel, they had to, Ms. Rawlinson spent 521.8 hours and Mr. Rubin spent 411.3 hours. If you compare that to the time that Mr. Kifori and I claimed, you don't get any sense of overreaching. And when you look at the district's billing versus ours, you don't get any sense of overreaching or unfairness. Also, I would ask that the Court, one other thought, the district only challenged .75 of my hours specifically and 4.4 of Mr. Kifori's hours specifically. The Court disagreed on the 4.4. The .75 hours that she disallowed of mine had to do with the motions for sanctions issue. I didn't brief it because it's .75 hours. But so I'm not contesting that. She can have that .75 hours. But as to all my other hours or Mr. Kifori's other hours, if you look at what we billed compared to what the district billed for the same activities, one might say, well, maybe we should do a reduction for block billing. But one might say, looking at this record, is the reason for the rule behind prohibiting block billing applicable here? Did these gentlemen fairly say, look, these are our limited hours, we can prove, and here they are? You were brought in for trial, right? Yes. And so all of your time is trial and trial preparation? I think I only spent 30 hours before November 1st. The trial was like November 14th. Mr. Kifori spent less than that because I was involved in some of the pretrial filings. So it's all ambush time or whatever you want to call it. The second request, and this was Was there time spent after trial? Yes, there was time spent after trial and post-trial motions. And I would note that the plaintiff's counsel spent four times less hours than defense counsel in responding to those motions. So suggesting that our hours should be reduced. And then what do you make about the time spent on the Kifori matter? You wouldn't have been there if you hadn't been advocating for his client. So it does relate to his client, and it is recoverable, and it's part of how It's a cost that should not be borne on the plaintiff. And the plaintiff's attorney shouldn't have to work for free for it, and we're a prevailing party on the issue, and it's substantially interrelated with litigation. So I think under the statute, we get it. Are you speaking about Mr. Goode in this case? Mr. Goode's time, yes. All right. The other request was, in our brief, we asked that the Court not remand this matter as, on some occasions, the Court keeps the matter and makes its own determination. I know a lot of cases in the system are aged. We went to trial back in 2001. Remanding it back down is a further delay. And there is some inference that this forum might have This forum is just as familiar with the record as the trial court judge. Let me just put it this way, because you've got the transcript. You don't have the live witnesses, but that doesn't really go to determining this issue. And so we'd ask that this Court, even though I know it's a burden on the Court's time, just resolve the issue in its opinion. We asked you last time to try the Settler case and it wasn't successful. Is there any chance this time? I don't know. I know there was no I'm not sure if you can ambush opposing counsel outside the courtroom. I think if the Court were to announce that it was going to make a final decision in this case, it might speed settlement. Well, we will make a decision. We'll certainly make a decision. We'll make a decision in every case. Thank you, Your Honor. Thank you, Your Honor. We acted decisively last time. You can be sure we'll act decisively this time as well. But I recommend counsel try to settle this. But I'm not going to defer a submission for that. If you decide that you've got fruitful negotiations going, you may contact the Court and ask that the matter be deferred. But unless we hear from you, we will proceed on to make a decision. Case argued. Please stand for a minute. This court is adjourned.
judges: D.W. Nelson, Kozinski, McKeown